Joe BUNCH, Appellant,

v.

**MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Respondent.**

No. 50240.

Supreme Court of Missouri,

Division No. 2.

Jan. 11, 1965.

James F. Koester, St. Louis, for plaintiff-appellant.

Mark M. Hennelly, Charles P. Lippert, St. Louis, for respondent.

STORCKMAN, Presiding Judge.

This is an action to recover damages in the sum of $100,000 for personal injuries sustained by the plaintiff on January 21, 1960, when the automobile he was driving was struck by the leading coal car of four being pushed by a locomotive at the crossing of the defendant's tracks and Carondelet Boulevard in the City of St. Louis. The case was submitted to the jury under the humanitarian doctrine for failure of the defendant to slacken the speed of the locomotive and coal cars. The jury, being unable to agree on a verdict, was discharged and a mistrial declared on February 27, 1963. On the following day the defendant, pursuant to S.Ct. Rule 72.02, V.A.M.R., filed its motion for judgment in accordance with its motion for a directed verdict which, in due course, was sustained and judgment was entered in favor of the defendant. The plaintiff appealed and contends in this court that there was direct evidence that the speed of the train could have been slackened sufficiently to have avoided the accident and, in the alternative, that the court should have permitted a retrial of the case on other theories of negligence. The parties will be referred to as they were designated in the trial court.

At the place in question, Carondelet Boulevard runs generally east and west and the defendant's single set of tracks extends north and south. The plaintiff was driving his automobile west near the center line of Carondelet on his way to work at about 6:30 a. m. on January 21, 1960. The four coal cars, each 52 feet long, were being pushed north by a locomotive. It was near daybreak but still dark and the headlights of the automobile and the locomotive were turned on. The crossing was equipped with electric flasher-type warning signals. It is undisputed that the lights were flashing as the plaintiff approached the crossing and were seen in operation by the plaintiff. There were two streetlamps at the intersection and at least one of them was lighted at the time. The plaintiff testified he did not hear any whistle or bell sounded until after the accident.

The plaintiff was familiar with the crossing having passed over it every morning and every afternoon for about a year on his way to and from work. The plaintiff looked to his left when he was about 100 feet from the crossing and saw the headlight and "the bulk of the engine" about 250 feet south of the crossing; he did not see anything out ahead of the locomotive. It looked to the plaintiff as if the engine "was setting still". When plaintiff first saw the engine, he was driving 20 to 23 miles per hour. He then took his eyes "off the train and looked straight ahead and went on." He never looked to his left again. When he saw the flasher lights operating, he had slowed somewhat by removing his foot from the accelerator. When he got "right on the tracks", he heard a noise and "went for" his brakes, but by that time he was hit. When he was on the crossing and started to apply his brakes, the plaintiff was moving at the rate of about 18 miles per hour. Traveling at a speed of 18 to 20 miles per hour, he could have stopped his automobile within 40 to 45 feet after the first appearance of danger. The leading coal car struck plaintiff's automobile at the left rear door and plaintiff was thrown from the car and injured.

The plaintiff admitted that he had told a police officer after the accident that his brakes had failed and that he had been unable to stop before going onto the tracks. He denied that he had told employees of the defendant the same thing immediately after the accident. There was evidence that the plaintiff had had his brakes repaired about three months before the collision, and a mechanic who examined the wrecked automobile sometime after the occurrence testified that the brakes appeared to be in good operating condition.

A junkyard with a small building on it was located in the southeast quadrant of the intersection but apparently this did not obstruct in any substantial degree the view

of the plaintiff or defendant's engineer. Excerpts from the depositions of defendant's engineer and two brakemen were read into evidence by the plaintiff as a part of his case. This depositional evidence tended to show that the engineer first observed the headlights of plaintiff's automobile when it was about 300 feet east of the crossing; he next saw the automobile when it emerged from behind the junkyard building about 60 to 80 feet from the tracks. Primarily he was watching the brakeman on the lead coal car because he was required to take signals from him. All during the time in question, the engineer was ringing the bell and blowing the locomotive horn, two longs, one short, and one extremely long, until he completely occupied the crossing. The train was moving at five or six miles per hour and its speed did not vary from the time the engineer first saw plaintiff's car until the collision occurred. When the engineer observed the automobile, there was nothing to indicate to him that the plaintiff was not going to stop before going onto the tracks; the engineer made no application of the train brakes until about the time the impact occurred. He did not get any signal from the brakeman until he started to swing his lantern just before the collision.

There were no reflectors or lights on the coal cars other than the signal lanterns of the two brakemen on the leading coal car. The four coal cars were being moved from an industrial plant to where the rest of the train was standing. According to the testimony, this was an everyday occurrence. Brakeman Nagel testified his signal light was on the outside at the front of the lead car and it was shining toward the plaintiff. Nagel further testified that when he first saw the plaintiff's automobile, it was approaching at a pretty good speed. Then it slowed up, and Nagel thought it was going to stop, but instead it increased its speed and ran onto the tracks in front of the coal car. When the collision occurred, broken glass from the automobile was thrown up into the coal car. The first question is

whether the evidence was sufficient to support a submission of humanitarian negligence in failing to slacken the speed of the train.

In determining the sufficiency of the evidence to support the submission, the reviewing court must consider as true the evidence favorable to the plaintiff's case together with all favorable inferences that can reasonably be drawn therefrom, and evidence to the contrary must be rejected. The defendant contends, among other things, that there was no substantial evidence, either direct or circumstantial, that the defendant had the ability, after the plaintiff came into a position of imminent peril, to slacken the speed of its train sufficiently to avoid the collision. The plaintiff contends, on the other hand, that he "almost escaped" and there was direct evidence to furnish the necessary proof. The plaintiff's instruction submitting humanitarian negligence hypothesized that the defendant's employees in the exercise of ordinary care could have seen the plaintiff in a position of imminent peril "in time thereafter by the exercise of ordinary care and with the means and appliances then and there at hand and with reasonable safety to defendant's equipment and all persons therein to have slackened the speed of said locomotive and coal cars," and thereby avoided the collision and plaintiff's injury.

A humanitarian case which leaves one or more of the essential elements to guesswork, speculation, or conjecture is not for the jury. Moore v. Ervin, Mo., 374 S.W.2d 142, 149 [3]; Davis v. St. Louis Public Service Co., Mo., 316 S.W.2d 494, 497 [4]. The plaintiff does not deny that the defendant's ability to slacken the speed of the train in time to avoid the collision was an essential element of his case but contends that the proof was sufficient. The plaintiff testified he was about 100 feet east of the crossing when he saw the engine about 250 feet to the south. The length of the coal cars indicates that the north end of the leading coal car was at

that time about 42 feet south of the crossing. The defendant also testified that he could have stopped his automobile within 40 to 45 feet traveling at a speed of 18 to 20 miles per hour. Based on the evidence in the record, the front of the lead coal car would have been about 24 feet from the crossing when the plaintiff was 45 feet east of that point.

The plaintiff says he was oblivious to the approach of the train as shown by his testimony that after he looked to the left and saw the engine, which he thought was stationary, he did not look at the engine again but looked straight ahead and traveled at the same speed until he arrived at the crossing and heard a noise to his left just before the collision occurred. The members of a train crew upon seeing the motor vehicle approaching the railroad crossing while the vehicle was still in a place of safety, and at such distance as to allow the driver a reasonable opportunity to stop before going into the path of the train, were entitled to assume that the motorist was not oblivious to the approach of the train and would stop short of its path unless the driver showed some reasonable appearance of being oblivious. Reedy v. Missouri-Kansas-Texas R. Co., Mo., 347 S.W.2d 111, 116 [3]; Stith v. St. Louis Public Service Co., 363 Mo. 442, 251 S.W. 2d 693, 696–967 [6], 34 A.L.R.2d 972. It follows that obliviousness, of which there is no discernible manifestation, is not sufficient to extend the zone of imminent peril. The darkness prevented the crew members from seeing whether the plaintiff appeared to be attentive. The warning lights at the crossing were flashing. The testimony of the crew members was that there was nothing to indicate that the automobile would not be stopped before it reached the crossing. In fact, brakeman Nagel testified that the automobile appeared to be slowing down, then speeded up as it neared the crossing. The plaintiff himself confirmed that he slowed somewhat by releasing the pressure on the accelerator when he saw the crossing lights flashing. He

cannot rely upon obliviousness in these circumstances.

There was testimony by the engineer that he applied the brakes on the train at about the time of the collision; however, there is no evidence as to the type of brakes or their condition, the load or tonnage in the coal cars, whether the train was operating on a grade or otherwise, the type of locomotive and other equipment. These are matters that ordinarily have to be taken into consideration in forming an opinion regarding the distance in which a train could be stopped or its speed slackened. The plaintiff asserts that proof of these factors and opinion evidence based thereon was not necessary. He cites Woods v. Kurn, Mo.App., 183 S.W.2d 852, Stith v. St. Louis Public Service Co., 363 Mo. 442, 251 S.W.2d 693, 34 A.L.R.2d 972, Smith v. Thompson, 346 Mo. 502, 142 S.W.2d 70, and Diel v. St. Louis Public Service Co., 238 Mo.App. 1046, 192 S.W.2d 608. In general, the distances involved in the cited cases and the time for the defendant to take action were such that it was obvious that defendant's vehicle could have been slackened somewhat. They are not controlling or persuasive on the facts of the instant case.

Since the zone of peril was not enlarged by reason of obliviousness, there was no humanitarian duty on the part of defendant's employees to take evasive action until the plaintiff was 45 feet or less from the crossing. Two additional factors serve to reduce the time for effective action and to prevent application of the "almost escaping" doctrine. One is that two reaction times were involved. The engineer testified that it was his duty to take signals from the switchman; therefore, allowance would have to be made for reaction time for the switchman to comprehend the situation of imminent peril and signal the engineer. The engineer would have to receive the signal and to react to it by applying the brakes. The other factor is that the plaintiff testified that he applied his brakes

rather than accelerating or permitting the automobile's momentum to carry it across ahead of the train. These and other facts in evidence left the ability to slacken the speed of the train entirely in the realm of speculation.

We conclude that there was no substantial evidence on which a jury could find that after the plaintiff came into a position of imminent peril the defendant's engineer could have slackened the speed of the locomotive and coal cars sufficiently to have avoided the collision; and the trial court, therefore, properly entered judgment for the defendant. Moore v. Ervin, Mo., 374 S.W.2d 142, 146 [2]; Stephens v. Thompson, Mo., 293 S.W.2d 392, 395 [6]; Hunt v. Chicago, M., St. P. & P. R. Co., 359 Mo. 1089, 225 S.W.2d 738, 740 [2]; West v. St. Louis-San Francisco Ry. Co., Mo., 295 S. W.2d 48, 54–55 [8, 9]; Taylor v. Missouri, K. & T. R. Co., 357 Mo. 1086, 212 S.W.2d 412, 414 [1].

 The plaintiff further contends that there were other theories of negligence upon which he could proceed and that the cause should be remanded unless the reviewing court is convinced that the facts are such that a recovery cannot be had citing Smith v. Terminal R. Ass'n of St. Louis, Mo.App., 160 S.W.2d 476; Lamont v. Thompson, Mo., 303 S.W.2d 589; Crews v. Illinois Terminal R. Co., Mo.App., 260 S. W.2d 765, and Wren v. St. Louis Public Service Co., Mo., 333 S.W.2d 92. The plaintiff suggests that he could make a submissible case on a failure to warn of the approach of the unlighted coal cars. This theory of negligence was pleaded by the plaintiff, and there was evidence as to warnings given. The failure to warn appears to have been fully developed at the trial. The plaintiff testified that an automobile had passed over the crossing some distance ahead of him while the flasher lights were operating, and he undertook to prove that it was a practice or custom of motorists to drive over the crossing while the flasher lights were operating.

The contention appears to have more weakness than substance, but it need not be explored because the question has not been presented here and is mentioned only by way of argument.

Our attention has not been directed to anything that might be termed a misadventure in that a ground of recovery, appearing to be reasonably valid, was not pleaded or anticipated in the evidence. On the contrary, it appears that the plaintiff's submission was a matter of legal strategy. A judgment should not be reversed and the cause remanded for an additional trial or trials merely to permit a party to experiment with different theories as to his adversary's liability. Borrson v. Missouri-Kansas-Texas R. Co., 351 Mo. 229, 172 S. W.2d 835, 851 [15]; Farmer v. Taylor, Mo. App., 301 S.W.2d 429, 434–435 [10].

Accordingly the judgment is affirmed.

EAGER, J., concurs.

FINCH, J., not participating because not a member of the court when cause was submitted.